# HARVEY FRANKLIN BOYD v. STATE OF MARYLAND

[No. 905, September Term, 1981.]

*Decided March 5, 1982.*

The cause was submitted to GILBERT, C. J., and MOYLAN and WILNER, JJ.

Submitted by *Alan H. Murrell, Public Defender,* and *Michael R. Malloy, Assistant Public Defender,* for appellant.

Submitted by *Stephen H. Sachs, Attorney General,*

*Michael A. Anselmi, Assistant Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Robert Dean, Assistant State's Attorney for Montgomery County,* for appellee.

WILNER, J., delivered the opinion of the Court.

Appellant was convicted in the Circuit Court for Montgomery County of armed robbery and use of a handgun in the commission of a felony, for which he was sentenced to a total of thirty-five years in prison. He claims in this appeal that because of a violation of the Interstate Agreement on Detainers (IAD), codified as Md. Code art. 27, §§ 616A — 616R, the indictment upon which his convictions rested lost its vitality, and that he never should have been brought to trial on it.

The circumstances here are most unusual, and the issue raised by appellant is a novel one.

It appears that in the spring of 1978, appellant, being at the time an escapee from the Patuxent Institution, sought to support himself by robbing Safeway stores in and around the District of Columbia. He seems to have been a bit too careless in some of his ventures, however, for (1) on May 10, 1978, he was indicted in Prince George's County for armed robbery and various associated offenses arising out of the robbery of a Safeway store on March 31, 1978; (2) on May 25, 1978, he was indicted in Montgomery County for similar offenses arising from the robbery of another Safeway store on April 18, 1978; and (3) on June 22, 1978, he was indicted in the District of Columbia for robbing a third Safeway store on April 7, 1978.

Although the District of Columbia was the last of the three jurisdictions to indict appellant, it was the first to acquire custody of him. He was arrested there on April 19, 1978 — the day after the last robbery — and incarcerated in lieu of $200,000 bond. Instead of being placed in the District of Columbia Jail, appellant was apparently committed to the Lorton Reformatory, a correctional institution located in

Lorton, Virginia, but owned and operated by the D. C. correctional authorities.

On May 26, 1978, a bench warrant was issued in Montgomery County for appellant's arrest. On June 5, the county sheriff sent a copy of the indictment and the bench warrant to the Fugitive Squad of the (D. C.) Metropolitan Police Department, advising that appellant was in the D. C. Jail and requesting that the warrant be filed as a detainer.[1] At some point, the Montgomery County action was communicated to the District of Columbia correctional authorities, for on June 9, 1978, the Records Administrator of the D. C. Department of Corrections made a note of the Montgomery County detainer and gave appellant written notice that "A DETAINER HAS BEEN PLACED AGAINST YOU BY: METROPOLITAN POLICE DEPARTMENT IN FAVOR OF: MONTGOMERY COUNTY, MARYLAND CHARGING YOU WITH: A/ROBBERY, ASSAULT, AND USE OF HANDGUN (FELONY)."[2]

Notwithstanding the obvious awareness of the D. C. authorities that appellant was in their custody, several weeks later the Metropolitan Police Fugitive Squad responded to the sheriff's request with the advice that appellant was *not* in their custody, but "that they were familiar with Mr. Boyd [appellant] and they would like to keep the warrant down there in their jurisdiction and they would attempt to locate Mr. Boyd *on the street*."[3] (Emphasis supplied.)

---

1. According to the sheriff, all detainers directed to the District of Columbia had to be filed through the Metropolitan Police Fugitive Squad.

2. The document given to appellant, as it appears in the record before us, contains only the information quoted above, and not the additional advice required by Art. III (c) of IAD: "his right to make a request for final disposition of the indictment . . . on which the detainer is based." Whether that information was given to appellant in some other way is not clear.

3. It is not clear what prompted this bit of misinformation. Although it appears that appellant was not at the D. C. Jail, as the Montgomery County prosecutor and sheriff thought, he was clearly in the custody of the D. C. Correctional authorities. The records before us indicate that at some point after his arrest, appellant was temporarily released by the D. C. authorities to Prince George's County in order that he could be arraigned on the charges pending there. The arraignment took place on June 8, 1978, following which appellant was returned to the District authorities.

With this news, supposedly from "the horse's mouth," the sheriff entered appellant's name in the National Criminal Information Center data bank so that the county would be notified if appellant were arrested anywhere in the country, but apparently did nothing more of an affirmative nature to locate him. Though presumably advised of the county detainer, appellant did not immediately pursue his rights under the IAD, to which both the District and Maryland are parties.

On August 30, 1978, appellant proceeded to trial in the District. Pursuant to a plea bargain, he pled guilty to armed robbery and, following a presentence investigation, he was, on November 1, 1978, sentenced to a term of from ten to thirty years. Appellant was recommitted to Lorton to begin serving his sentence.

On December 19, 1978, the State's Attorney for Prince George's County filed with the Superintendent of Lorton a request for temporary custody of appellant pursuant to Art. IV (a) of the IAD (Md. Code art. 27, § 616E) in order to try him on the open indictment in that county. He proposed to take custody of appellant at Lorton on January 29, 1979, for trial to commence on February 5, 1979. Pursuant to that request, appellant was in fact brought into Maryland where, on February 5, 1979, he pled guilty to one count of armed robbery and was sentenced to a term of ten years, consecutive to that being served in the District of Columbia.

Despite the D. C. Record Administrator's awareness of the Montgomery County detainer, and despite the clear mandate of Art. IV(b) of the IAD that the D. C. authorities "furnish all other officers and appropriate courts in the receiving state [*i.e.*, Maryland] who have lodged detainers against the prisoner... with notices informing them of the request for custody," no one bothered to notify the Montgomery County authorities of the Prince George's County request or that appellant would be in Maryland pursuant to it.

When he appeared in court in Prince George's County, appellant mentioned, in the course of his plea for leniency,

that "I got to go to Montgomery County sometime, I don't know when, for armed robbery charge over there." The remark passed without comment. Thus, his business finished in Prince George's County, appellant was returned to the District of Columbia without the Montgomery County authorities ever knowing he was in the State.

Nothing more happened until May, 1980, when the Metropolitan Police Department advised the Montgomery County sheriff that it was still "unable to locate Mr. Boyd in the District of Columbia," that D. C. would be returning the warrant, and that appellant might possibly be incarcerated in Prince George's County. The sheriff thereupon recalled the warrant from the District of Columbia and filed a detainer with Prince George's County.[4]

Eventually, the Montgomery County authorities learned that appellant was indeed at Lorton. On June 10, 1980, the sheriff refiled the warrant with the Metropolitan Police Department, and on September 26, 1980, Montgomery County filed a request under IAD with the District of Columbia Department of Corrections for temporary custody of appellant, proposing to try him on the open indictment on November 13, 1980.

Appellant's response to the Montgomery County action was a motion to dismiss the indictment for failure to comply with Art. IV (e) of IAD (Md. Code art. 27, § 616E (e)). Specifically, he argued that, once he was brought into Maryland pursuant to the Prince George's County request,

---

4. This second bit of misinformation emanating from the Metropolitan Police Department touched off a comedy of errors. It turned out that appellant's brother, Roger Boyd, who on one or more occasions had used appellant's identification, was incarcerated in Prince George's County; and, on two occasions, he (the brother) was erroneously produced in Montgomery County to be arraigned on appellant's open indictment. The confusion was compounded by an apparent lack of communication between the Montgomery County sheriff and the prosecutor. The sheriff learned in June that appellant was at Lorton and, on June 10, 1980, refiled the warrant with the Metropolitan Police Department. The prosecutor, apparently unaware of this, had Roger brought from Prince George's County for arraignment on July 25, 1980. It was not until August, 1980, said the prosecutor, that he learned from the Public Defender's office (which was representing Roger) that appellant "was located in the D. C. or Federal system." He then directed his staff to ascertain appellant's whereabouts and to proceed under IAD.

it was incumbent upon the State to try all open indictments upon which detainers had been lodged, and that any such indictment not disposed of prior to his return to the District had to be dismissed. The circuit court rejected that motion, following which appellant was tried, convicted, and sentenced.

In this appeal, appellant raises the single issue of whether the court erred in denying his motion to dismiss based on the requirements of IAD.

The history of IAD was summarized by the United States Supreme Court in *United States v. Mauro,* 436 U.S. 340 (1978); *see also Parks v. State,* 41 Md.App. 381, 383 (1979), *aff'd* 287 Md. 11 (1980); Abramson, *Criminal Detainers,* 91, *et seq.* (1979). Its function, a dual one, was well stated by Abramson, *supra,* at 93: "The IAD not only provides the inmate with a method of resolving the charges underlying detainers from another jurisdiction, but also provides prosecutors with a method for securing inmates incarcerated in other jurisdictions for trial before the expiration of their sentences."

This dual aspect of the Agreement is evident in both its history and its provisions, and it ought to be kept firmly in mind. The Agreement recognized a commonality of interest among the accused, the accuser, and the current custodian in having open charges in the "accuser" jurisdiction efficiently resolved, and established procedures to achieve that end. It did this, essentially, by (1) requiring the custodial jurisdiction to inform the prisoner of all detainers filed against him by other jurisdictions (Art. III (c)); (2) enabling the *prisoner* to force a speedy trial on the charges underlying such detainers by demanding a prompt hearing and thus setting in motion procedures for his release to the accusing State for that purpose (Art. III (a)); (3) enabling the *accusing State* to secure the prisoner's attendance for purposes of trial with or without a request by the prisoner (Arts. IV and V); and (4) providing acceptable procedures for the prisoner's temporary release, interim custody, and return (Art. V (e)).

In creating this mechanism, the Agreement not only serves to protect the legitimate interests of the prisoner in

having open charges expeditiously resolved, but also to harmonize the conflicting sovereign interests of the two States involved and to minimize any disruption to the prison regimen and the prisoner's participation in it.[5] To that latter end, the Agreement seeks to limit the interjurisdictional transfer of prisoners by requiring that the receiving State, once it has obtained custody of the prisoner under the Act, wrap up its business with him, so to speak, before returning him to the custodial (sending) State.

This is ordinarily not too difficult when there is but one set of charges pending in the receiving State, or where, if there are multiple sets of charges, they emanate from the same prosecuting authority. The Agreement recognizes, however, the possibility that more than one prosecuting authority in a single State may want a prisoner for trial, and it places an initial coordinative responsibility on the correctional authorities of the custodial State in such cases. Whether a request for temporary custody emanates from the prisoner under Art. III or a prosecutor in the receiving State under Art. IV, the correctional authority of the custodial State is plainly responsible for notifying all other prosecutors in the receiving State who have lodged detainers against the prisoner of the request, and thus of his availability for trial.[6]

---

**5.** *See United States ex rel. Esola v. Groomes,* 520 F.2d 830, 837 (3d Cir. 1975):

> "When a prisoner is needlessly shuttled between two jurisdictions, then any meaningful participation in an ongoing treatment program is effectively foreclosed for two reasons. First, participation requires physical presence and the continuous physical presence of a prisoner is not possible when multiple trips to a foreign jurisdiction are made. Secondly, the psychological strain resulting from uncertainty about any future sentence decreases an inmate's desire to take advantage of institutional opportunities." (Footnote omitted.)

**6.** Art. III (d) provides that *any* request for final disposition made by a prisoner operates as a request for disposition of *all* untried charges "on the basis of which detainers have been lodged against the prisoner from the state to whose prosecuting official the request for final disposition is specifically directed." The custodial authority in that instance "shall forthwith notify all appropriate prosecuting officers and courts in the several jurisdictions within the state to which the prisoner's request for final disposition is being sent of the proceeding being initiated by the prisoner." Similarly, Art. IV (b) provides that, upon receiving a request for custody from a prosecutor, the custodial authority "shall furnish all other officers

It is in that context that the Agreement further provides, in Art. III (d) and Art. IV (e), that "[i]f trial is not had on any indictment, information or complaint *contemplated hereby* prior to the prisoner's being returned to the original place of imprisonment [pursuant to Article V (e) hereof,] such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." (Emphasis supplied.) [7]

Those sections of the Agreement have been generally construed literally, and, with few exceptions, if a prosecutor acquires custody of a prisoner under the Agreement and permits his return before the completion of trial, the indictment has been dismissed. *See, for example, Commonwealth v. Merlo,* 364 A.2d 391 (Pa.Super. 1976); *People v. Reyes,* 98 Cal.App.3d 524 (1979); *United States v. Sorrell,* 413 F.Supp. 138 (E.D.Pa. 1976), *aff'd* 562 F.2d 227 (3d Cir. 1977), *cert. den.* 436 U.S. 949 (1978); *and cf. United States v. Ford,* reported with *United States v. Mauro, supra,* 436 U.S. 340. *Compare,* however, *People v. Dye,* 371 N.E.2d 630 (Ill. 1977); *Neville v. Friedman,* 367 N.E.2d 1341 (Ill. 1977), *cert. den.* 437 U.S. 903 (1978); *People v. Bernstein,* 344 N.Y.S.2d 786 (Dutchess Co.Ct. 1973); *State ex rel. Stanley v. Davis,* 569 S.W.2d 202 (Mo.App. 1978); *United States v. Chico,* 558 F.2d 1047 (2d Cir. 1977), *cert. den.* 436 U.S. 947 (1978).

Relying primarily on *State v. Keener,* 577 P.2d 1182 (Kan. 1978), *cert. den.* 439 U.S. 953 (1978), appellant argues that Art. IV (e) is applicable here and thus requires that the indictment be dismissed. We find *Keener* to be distinguishable, however, and conclude that Art. IV (e) is not applicable.

---

and appropriate courts in the receiving state who have lodged detainers against the prisoner... with notices informing them of the request for custody or availability and of the reasons therefor."

**7.** The bracketed phrase appears in Art. IV (e), but not in Art. III (d). That is the only relevant difference between the two provisions. Art. V (e) provides that "[a]t the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be returned to the sending state."

Mr. Keener, a Federal prisoner, was released to the State of Kansas under IAD pursuant to Art. IV requests by two Kansas counties — Sedgwick and Harvey. Sedgwick County was aware of the Harvey County charges; not only were they listed in the Federal warden's response to the Sedgwick County request, but Sedgwick actually released Keener to Harvey County after his arrival in Kansas in order that he could be arraigned on the Harvey County charges. Following his arraignment in Harvey County but before trial, Keener was returned to Sedgwick County where he was convicted on a guilty plea. Without the knowledge or consent of Harvey County, he was then returned by Sedgwick County to Federal jurisdiction.

Over Keener's objection, he was subsequently sent back to Harvey County where he was tried and convicted. The Kansas Supreme Court reversed the conviction in Harvey County, concluding simply that "[w]hen the state returned defendant without having tried him on all the outstanding charges pending in this state, defendant was entitled to have them dismissed with prejudice." 577 P.2d at 1184.

The distinctions to be drawn between *Keener* and the case now before us are obvious ones. The Federal authorities delivered Keener to Kansas pursuant to *both* requests;[8] Sedgwick County was aware of the open charges in Harvey County and presumably, of Harvey County's invocation of IAD; and Harvey County was aware that Keener was in the State. In that set of circumstances, the appellate court's conclusion is not unreasonable. The State had every opportunity to try Keener on all open charges and, through its own negligence, failed to do so. In that regard, the situation was not qualitatively different from the more frequent one in which the State, proceeding through a single prosecuting

---

8. Although the Federal warden responded to the Sedgwick County request, the Harvey County request for custody had already been filed, and the charges underlying it were, as noted, specifically mentioned in the offer of custody.

authority, erroneously returns the defendant prior to completion of the proceedings. Indeed, the cases relied upon by the Kansas court all involved that type of situation.

The key to *this* case lies in the actual language of Art. IV (e). That section does not require the dismissal of every indictment remaining untried after return of the prisoner, but only of those indictments "contemplated hereby." Those words are obviously limiting ones, and they surely have some importance.

The Agreement, as we have seen, is a comprehensive one, and all of its parts have to be read together, in harmony, in order to carry out its dual purpose. In that light, an indictment "contemplated" in Art. IV (e) can only mean an indictment which (1) forms the basis of a detainer lodged against the prisoner pursuant to Art. III (a), *and* (2) is the object of either a request for final disposition by the prisoner pursuant to Art. III (a) or a request by the prosecutor for temporary custody under Art. IV (a). That is the clear thrust of *United States v. Mauro, supra,* 436 U.S. 340. *See also Fasano v. Hall,* 476 F.Supp. 291 (D.Mass. 1979), *aff'd on other grounds,* 615 F.2d 555 (1st Cir. 1980), *cert. den.* 449 U.S. 867, 101 S.Ct. 201 (1980).

Unlike *Keener,* however, the Montgomery County indictment does not meet that two-part test. Although, at the time of appellant's first presence in Maryland pursuant to the Prince George's County request a detainer had been lodged against him based upon the Montgomery County indictment, no request had been made by either appellant or Montgomery County for the disposition of that indictment, and appellant was not delivered to Maryland in order to be tried on that indictment. The second, critical, prong is therefore absent. For that reason, we find that the indictment before us was not one "contemplated" by Art. IV (e) in the context of appellant's earlier appearance in Prince

George's County, and that that article does not, therefore, require its dismissal.[9]

*Judgment affirmed; appellant to pay the costs.*

---

**9.** By reason of this analysis, we need not consider the State's curious argument that the sheriff's communication with the Metropolitan Police Department in June, 1978, enclosing a copy of the warrant and the indictment did not constitute a "detainer," and that IAD is not applicable because no detainer had been filed by Montgomery County at the time of appellant's appearance in Price George's County. *See, however, State v. Boone,* 40 Md.App. 41, 44 (1978): "The [IAD] itself does not define the word 'detainer' but it is generally recognized that the term refers to a notice directed to prison authorities informing them that charges are pending in another jurisdiction against an inmate." *Also Bean v. United States,* 409 A.2d 1064 (D.C. 1979); *United States v. Candelaria,* 131 F.Supp. 797, 805 (S.D.Cal. 1955), quoting from *Handbook on Interstate Crime Control; State v. Newman,* 367 A.2d 200, 202 (R.I. 1976); *Lawrence v. Blackwell,* 298 F.Supp. 708 (N.D.Ga. 1969); *Hystad v. Rhay,* 533 P.2d 409 (Wash.App. 1975).