574 A.2d 918

STATE of Maryland

v.

Anthony Jerome JEFFERSON.

No. 130, Sept. Term, 1989.

Court of Appeals of Maryland.

June 12, 1990.

Jillyn K. Schulze, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for petitioner.

David C. Gardner, Assigned Public Defender (Alan H. Murrell, Public Defender, on brief), Rockville, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and CHASANOW, JJ.

MURPHY, Chief Judge.

Anthony Jerome Jefferson was charged in the District Court of Maryland, in Montgomery County, with theft of goods over $300. He was then confined to Lorton Penitentiary in Virginia for another offense. On November 23, 1987, an arrest warrant was issued for Jefferson on the theft charge. It was lodged as a detainer for Jefferson's continued detention and served upon him at Lorton on April 19, 1988.

Pursuant to the Interstate Agreement on Detainers (IAD), which consists of nine Articles and supplemental provisions, codified as Maryland Code (1957, 1987 Repl. Vol.), Article 27, §§ 616A–616R, Jefferson was transferred from Lorton to Montgomery County for trial before the District Court. On May 19, 1988, Jefferson was convicted of theft and sentenced to a term of imprisonment. On the same day, he appealed to the Circuit Court for Montgomery County under Code (1989 Repl.Vol.), § 12–401 of the Courts and Judicial Proceedings Article. This section authorizes "the defendant in a criminal case [to] appeal from a final judgment entered in the District Court." Section 12–401(d) specifies, with one exception, that the "appeal shall be tried de novo." Pending the de novo proceeding, which was scheduled for July 13, 1988, Jefferson was returned to Lorton.

Prior to his appeal de novo before the circuit court, Jefferson moved to dismiss the theft charges; he relied upon provisions contained in Article IV of the IAD. Codified within § 616E, this part of the Interstate Agreement, in subsection (a), authorizes officials of a jurisdiction, in which an "untried indictment, information or complaint" is pending, to have a prisoner against whom a detainer has been lodged, and who is serving a term of imprisonment in another state, transferred temporarily to their custody for trial. Subsection (c) provides that trial in such cases shall be commenced within 120 days of the arrival of the prisoner in the receiving state. Section 616E(e)—the so-called "anti-shuffling" provision of the Act—provides that "[i]f trial is

not had on any indictment, information or complaint contemplated hereby" prior to the prisoner's being returned to the original place of imprisonment, the court shall dismiss the charging document "with prejudice."

In support of his motion to dismiss, Jefferson argued that a de novo appeal is not in actuality a second proceeding, but a continuation of the District Court trial. He maintained that the two proceedings should be considered as one for purposes of applying the "anti-shuffling" provisions of § 616E(e), so that if the de novo appeal is not "had," prior to his return to prison, the charges must be dismissed. Jefferson noted that the purposes of the IAD include the expeditious resolution of outstanding detainers and the prevention of "shuffling" of prisoners between jurisdictions. He said that both of these problems continue to exist with de novo appeals since the appeal requires a retrial of the same charges, a recalling of witnesses, and the presence of the defendant. He thus urged that § 616E be interpreted to include de novo appeals as part of the "trial" that must be "had" before he may be returned to imprisonment in the sending state.

After reviewing the provisions and purposes of the IAD, the circuit court (Mitchell, J) agreed with Jefferson. It said that the IAD "mandates that a prisoner, transported for the purpose of resolving an outstanding criminal charge in another jurisdiction, be transported only once for a given jurisdiction and returned only after final disposition of the charges in the transferred state." The court held that the IAD was designed "to ensure that a jurisdiction requesting to obtain temporary custody of another jurisdiction's prisoner completes its business with the prisoner before returning him to the custodial jurisdiction." It said that a de novo appeal under the Maryland statute functions as if the case had not been heard before and as if no decision had been previously rendered in the District Court. Acting on the belief that the District Court judgment was nullified by the filing of the de novo appeal, the court concluded that the appeal in effect "returned the case to a pending status" and

therefore Jefferson's return to Lorton, prior to the completion of the de novo appeal, required dismissal of the charges under § 616E(e).

Upon the State's petition, we granted certiorari, pursuant to § 12–305 of the Courts Article, to consider whether, in the circumstances, § 616E(e) of the IAD was violated when Jefferson was returned to Lorton after the District Court trial but before his circuit court de novo appeal.[1]

## I.

The IAD is a compact among the states, the United States, and the District of Columbia. Enacted in Maryland in 1965, it recites in Article I (§ 616B) that the "party states find that charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation." The section further states that "it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." [2]

As we recognized in *Clipper v. State*, 295 Md. 303, 305–06, 455 A.2d 973 (1983), the IAD "prescribes the methods and procedures by which one jurisdiction may obtain temporary custody of an inmate imprisoned in another jurisdiction for purposes of trial on detainers based on

---

**1.** The Court of Appeals, not the Court of Special Appeals, has the authority to review cases "in which a circuit court has rendered a final judgment on appeal from the District Court." § 12–305. This authority is exercised by way of granting a writ of certiorari. *Id.*

**2.** A detainer within the contemplation of the IAD is "a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." *See* H.R.Rep. No. 91–1018, at 2 (1970); S.Rep. No. 91–1356, at 2 (1970); U.S.Code Cong. & Admin.News 1970, at 4864, 4865.

*untried indictments, informations or complaints* pending in the requesting jurisdiction." (Emphasis in original.) "The two basic goals sought to be achieved by the IAD are: (1) to encourage the expeditious disposition of charges; and (2) to provide cooperative procedures among member jurisdictions to facilitate such disposition." *Id.* at 307, 455 A.2d 973.

The IAD was enacted in part to avoid a "practice of filing detainers based on untried criminal charges that had little basis." *Carchman v. Nash*, 473 U.S. 716, 729, 105 S.Ct. 3401, 3408, 87 L.Ed.2d 516 (1985). Before the IAD, the majority of these detainers were withdrawn shortly before the prisoner was released. *Id.* at 729–30, 105 S.Ct. at 3408-09; H.R.Rep. No. 91–1018, at 3 (1970); S.Rep. No. 91–1356, at 3 (1970). "Undoubtedly, detainers [were] sometimes used by prosecutors to exact punishment without having to try a charge which they [believed] would not result in a conviction." *Carchman*, 473 U.S. at 729–30 n. 6, 105 S.Ct. at 3408 n. 6.

As *Carchman* recognized, unsubstantiated detainers based on untried charges have a detrimental effect on the prisoner's treatment. *Id.* at 730, 105 S.Ct. at 3409. It explained:

" '[T]he inmate is (1) deprived of an opportunity to obtain a sentence to run concurrently with the sentence being served at the time the detainer is filed; (2) classified as a maximum or close custody risk; (3) ineligible for initial assignments to less than maximum security prisons (i.e., honor farms or forestry camp work); (4) ineligible for trustee status; (5) not allowed to live in preferred living quarters such as dormitories; (6) ineligible for study-release programs or work-release programs; (7) ineligible to be transferred to preferred medium or minimum custody institutions within the correctional system, which includes the removal of any possibility of transfer to an institution more appropriate for youthful offenders; (8) not entitled to preferred prison jobs which carry higher wages and entitle [him] to additional good time credits

against [his] sentence; (9) inhibited by the denial of possibility of parole or any commutation of his sentence; (10) caused anxiety and thus hindered in the overall rehabilitation process since he cannot take maximum advantage of his institutional opportunities.' "

*Id.* at n. 8 (quoting *Cooper v. Lockhart,* 489 F.2d 308, 314, n. 10 (8th Cir.1973)). Because there was no uniform method to resolve detainers before the IAD, the detainers were potentially quite damaging for extended periods of time to the prisoner's rehabilitation at his place of imprisonment. *United States v. Mauro,* 436 U.S. 340, 358–59, 98 S.Ct. 1834, 1846–47, 56 L.Ed.2d 329 (1978).

This is the background which gave rise to inclusion of the "anti-shuffling" provision in Article IV of the IAD (§ 616E(e)). The provision has been interpreted as intending to "limit the interjurisdictional transfer of prisoners by requiring [the accusing jurisdiction] . . . [to] wrap up its business with [the prisoner], so to speak, before returning him to the custodial [jurisdiction]." *Boyd v. State,* 51 Md.App. 197, 203, 441 A.2d 1133, *aff'd,* 294 Md. 103, 447 A.2d 871 (1982) (adopting the reasons given in the opinion of the Court of Special Appeals). *Boyd* explained that the anti-shuffling provision assists in implementing the IAD's purpose of "minimiz[ing] any disruption to the prison regimen and the prisoner's participation in it." *Id.*[3]

## II.

The State urges that the nature of the de novo appeal, combined with the purposes of the IAD, allows the return

---

**3.** In *United States ex rel Esola v. Groomes,* 520 F.2d 830, 837 (3d Cir.1975), the court said:

"When a prisoner is needlessly shuttled between two jurisdictions, then any meaningful participation in an ongoing treatment program is effectively foreclosed for two reasons. First, participation requires physical presence and the continuous physical presence of a prisoner is not possible when multiple trips to a foreign jurisdiction are made. Secondly, the psychological strain resulting from uncertainty about any future sentence decreases an inmate's desire to take advantage of institutional opportunities."

of a prisoner after his District Court trial but before his de novo appeal. It claims that the circuit court appeal de novo acts as a second proceeding and not as a continuation of the District Court trial. Thus, it asserts that the District Court judgment against Jefferson satisfied the requirement of § 616E(e) that a "trial" be "had" on the "complaint contemplated hereby," and this is so regardless of whether the de novo appeal was "had" as well. Regarding the purpose of the IAD, the State maintains that dismissal of charges with prejudice is a drastic measure. It contends that the drafters of the IAD intended that the anti-shuffling provision be limited to circumstances where there has been no trial at all.

We said in *Hardy v. State*, 279 Md. 489, 493, 369 A.2d 1043 (1977), that the de novo appeal is treated as a wholly original proceeding as if the charges had not been heard before and no decision had been rendered. The issue in that case was whether a defendant had a right to a jury upon his de novo appeal in the circuit court. It was in that context that we commented upon the nature of the de novo proceeding ("de novo," we said, means "afresh" or "anew"). *Id.* Nothing in *Hardy* suggested that the District Court judgment was not a final adjudication in that court. We have always recognized that the de novo nature of the appeal does not change its basic character as an appeal from a final judgment, with the circuit court exercising appellate, rather than original jurisdiction. *See Harper v. State*, 312 Md. 396, 403–04, 540 A.2d 124 (1988); *Hardy*, 279 Md. at 492, 369 A.2d 1043. Indeed, the de novo appeal could not have been perfected in the circuit court until there had been a final District Court judgment. § 12–101(a) of the Courts Article. As we later said in *Stanton v. State*, 290 Md. 245, 248, 428 A.2d 1224 (1981), *Hardy* did not hold "that the mere entry or perfecting of a de novo appeal under § 12–401 of the Courts Article nullifies the District Court sentence prior to adjudication by the circuit court of the defendant's appeal." We noted that a defendant "may be incarcerated under the District Court sentence pending de-

termination of the de novo appeal." *Id.* at 249, 428 A.2d 1224; Md. Rule 4–349. Moreover, a trial judge may legally impose a sentence to run consecutively to an earlier imposed District Court sentence in an unrelated case even though the earlier sentence is pending de novo review in circuit court. *See Briggs v. State*, 289 Md. 23, 421 A.2d 1369 (1980) and *Stanton, supra*, 290 Md. at 249, 428 A.2d 1224. It is thus clear that the District Court trial is complete unto itself. It does not act as a preliminary proceeding to a possible de novo appeal. Nor does the de novo appeal "wipe the slate clean." *Stanton* at 249, 428 A.2d 1224.

We have considered Jefferson's argument that support for his position that the de novo appeal acts as an extension of the District Court trial may be found in *Justices of Boston Municipal Court v. Lydon*, 466 U.S. 294, 309, 104 S.Ct. 1805, 1813, 80 L.Ed.2d 311 (1984). There, the Court stated, quoting *Lydon v. Justices of Boston Municipal Court*, 698 F.2d 1, 12 (1st Cir.1982) (Campbell, J. dissenting):

> " 'While technically [the defendant] is "tried again," the second stage proceeding can be regarded as but an enlarged, fact-sensitive part of a single, continuous course of judicial proceedings during which, sooner or later, a defendant receives more—rather than less—of the process normally extended to criminal defendants in this nation.' "

The issue in *Lydon* concerned the extent to which the doctrine of double jeopardy applies to appeals de novo. The Supreme Court held that, for double jeopardy purposes, a de novo appeal should be regarded as a retrial after a reversal and remand of a conviction. It explained that, in both a retrial and a de novo appeal, jeopardy is "continuing" because there has been no acquittal. 466 U.S. at 308, 104 S.Ct. at 1813. It was in that context that the Court termed a de novo appeal as a "single, continuous course of judicial proceedings." *Id.* at 309, 104 S.Ct. at 1814. Manifestly, this language was not intended to require a District Court

trial and the ensuing de novo appeal to be treated as one. Indeed, the Court fully recognized in *Lydon* that the de novo appeal was in effect a second trial distinct from the first trial.

The "anti-shuffling" provision of § 616E(e) does not, by its terms, require the receiving state to keep a prisoner until the final disposition of the charges against him. It only requires that a "trial" be "had" on the charges. Had the IAD intended to require that the receiving state hold a prisoner until all appeals were exhausted, rather than just until completion of the trial, it would have said so in no uncertain language.

We conclude that § 616E(e) is inapplicable when, as here, the prisoner has been convicted by the District Court of the criminal charges underlying the detainer, files an appeal, and is returned to the sending state to await the scheduling of the de novo appeal. As explained in *Mauro*, "[t]he real concern of [§ 616E(e) ] was that, if the prisoner were returned to the sending State prior to the disposition of the charges in the receiving State, the detainer previously lodged against him would remain in effect with all its attendant problems." *Mauro*, 436 U.S. at 361 n. 26, 98 S.Ct. at 1847 n. 26. As we see it, however, the problems and uncertainties associated with detainers are based on *unsubstantiated* charges, or charges that remain lodged after the prisoner is returned. The detainer in this case was resolved with a District Court conviction against Jefferson; thus, the charge was no longer questionable or unsubstantiated. While the conviction may be overturned upon the conclusion of Jefferson's de novo appeal, obviously this is not a case where the prosecutors are using the detainer system "to exact punishment without having to try a charge which they feel would not result in a conviction." *Carchman, supra,* 473 U.S. at 729–30, n. 6, 105 S.Ct. at 3408, n. 6. In this regard, we note that the original detainer lodged against Jefferson informing Lorton that he was facing charges in Maryland was removed once his District Court trial ended in a conviction; thereafter, a second

detainer had to be issued to inform Lorton that Jefferson was wanted for his de novo appeal. Thus, Jefferson's rehabilitation was not obstructed by any uncertainties flowing from the issuance of the original detainer.

Certainly, the State is not required by § 616E(e) to retain custody of a prisoner appealing a circuit court conviction on the record to the Court of Special Appeals. We agree with *Shanks v. Commonwealth*, 574 S.W.2d 688, 690 (Ky.Ct. App.1978), which said, "To hold that a new detainer could not be filed to return [a prisoner] for [a] second trial [after his conviction has been reversed and remanded for a new trial] would be obvious error." For purposes of § 616E(e), we see no distinction between the two types of appeals.

At least three jurisdictions have held that the "anti-shuffling" provisions of § 616E(e) do not prohibit an accusing jurisdiction from returning a prisoner to his original place of imprisonment after a mistrial, but before his retrial. *United States v. Evans*, 423 F.Supp. 528 (S.D.N.Y.1976), *aff'd without opinion*, 556 F.2d 561 (2d Cir.1977); *Wilkett v. State*, 753 P.2d 383 (Okla.Crim.App.1988); *Shanks, supra*. These courts have strictly interpreted the word "trial" to mean that actual event.

The final judgment rendered against Jefferson in the District Court satisfied § 616E(e)'s requirement that a "trial" be "had" on the "complaint contemplated hereby," regardless of whether the de novo trial was "had" as well. Our holding today does not render the provisions of § 616E of the IAD discordant with its other purposes. It is true that a secondary purpose of the "anti-shuffling" provision is to ensure the physical presence of the prisoner and that the " 'continuous physical presence of a prisoner is not possible when multiple trips to a foreign jurisdiction are made.' " *Boyd, supra*, 51 Md.App. at 203 n. 5, 441 A.2d 1133, quoting *United States ex rel. Esola v. Groomes*, 520 F.2d 830, 837 (3d Cir.1975). However, *Boyd* also notes that § 616E(e) is intended to limit jurisdictional transfers, not eliminate them altogether. *Id.* at 203, 441 A.2d 1133.

It is also true that a purpose of the IAD is to expedite the resolution of the charges against a prisoner in order to protect against "staleness and difficulty of proof." *Clipper, supra,* 295 Md. at 309, 455 A.2d 973. There are "speedy trial" provisions to ensure that the State complies with this purpose. *See* Articles III(a), IV(c) of the IAD. However, Jefferson was granted his speedy trial in the District Court. He has remedies under Article III of the IAD by which he can ensure a speedy trial of the second detainer filed against him. He also has constitutional speedy trial remedies. Nothing in our holding today interferes with these rights.

JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENT.