KRAUSER, Judge.
 

 Appellant Robert C. Painter Jr. challenges the sufficiency of the evidence that was used to convict him in the Circuit Court for Frederick County in what may be the closest thing to a “rustling” case a Maryland court may ever see. Appellant, it seems, stole a number of calves from two different Maryland farms over a one week period and then sold them at a livestock auction in Pennsylvania. While hardly the stuff of campfire legends, it did result in his being convicted of two counts of theft and one count of theft by continuing scheme.
 

 What makes this appeal noteworthy, however, is not the novelty or the nature of his crime, but appellant’s claim that his convictions should be overturned under the Interstate Agreement on Detainers Act (“IAD”), Md.Code (1999), §§ 8-402 to 8-411 of the Correctional Services Article (“CSA”). At the time that he was charged in Frederick County, Maryland with these offenses, he was incarcerated in Fulton County,
 
 *6
 
 Pennsylvania. After waiving extradition, he was transported to Maryland and convicted by a jury in the Circuit Court for Frederick County of the Maryland offenses.
 

 Before sentence was imposed, however, appellant was released to Pennsylvania authorities to answer unrelated criminal charges in Mifflin County, Pennsylvania. To assure his prompt return, Maryland lodged a detainer in that county. A week later, appellant was returned to Maryland for sentencing. At sentencing, the circuit court merged the separate felony theft convictions into the theft by continuing scheme conviction and sentenced appellant to a term of fifteen years’ imprisonment. The harshness of the sentence was a reflection of the fact that appellant was no stranger to thievery.
 

 But it is not the sentence about which appellant complains. His ire is directed at having been transported back and forth between Maryland and Pennsylvania, which he claims violated both the “anti-shuffling” provision and the “30-day” rule of the IAJD. Because we do not agree and find that there was sufficient evidence to support his convictions, we shall affirm the judgment of the Frederick County circuit court.
 

 Background
 

 Sometime during the evening of January 15, 2002, or the early morning of January 16, 2002, four Holstein heifer calves
 
 [1]
 
 were stolen from the farm of James Noffsinger. Two of the calves were a month and a half old; the other two were only a few days old. Three of the four calves, Noffsinger testified at trial, were of “a black and white mix,” like most of his herd. The fourth calf was “predominantly all black.” That calf could be readily identified because its front legs were “turned down” at birth. The two younger calves were worth approximately $400 to $500, and the two older calves were
 
 *7
 
 worth approximately $300 to $400. None of the calves bore any identification tags.
 

 Noffsinger reported the theft to authorities, who, in turn, notified local livestock markets about the missing calves. Among those notified was Eugene Glick, the owner of the Belleville Livestock Market in Pennsylvania. Glick testified at trial that appellant had brought Holstein calves to his market to be sold at auction on the very day of the theft, January 16, 2002. Appellant informed Glick that the calves were bred from cattle that he had purchased at the Belleville market. That statement Glick found “a little bit odd.” Appellant, he explained, had bought those cows only three or four months earlier, and the gestation period for a cow is nine months.
 

 Of the five calves that appellant brought to the January 16th auction, three of them, according to the market’s records, were sold to a John Diehl. He paid $1,230 for them. Upon learning of that sale, Noffsinger went to the Diehl farm, and, based on the calves’ size and markings, he identified two of the calves as his. A third calf he believed belonged to him but he could not be “positively sure.” With Diehl’s permission, Noffsinger took all three calves back to his farm in Frederick, but later returned one of the calves after concluding that it was not one of his.
 

 On January 16, 2002, appellant also sold a predominantly black calf with “turned under” legs to an Amish farmer in Pennsylvania. Unfortunately, Noffsinger was not able to identify or recover that calf because it died soon after the sale. The missing fourth calf was never located.
 

 A week later, on the night of January 22 or the morning of January 23, 2002, nine Holstein heifer calves were stolen from the farm of Edward O’Hara, a neighbor of Noffsinger’s. Eight of those calves were worth $700 each, and the ninth was worth $450.
 

 Unlike Nonsigner’s calves, most of O’Hara’s calves were registered and tagged. O’Hara testified that he placed permanent round button ear tags provided by the Holstein Association USA on his cattle and registered them with that
 
 *8
 
 organization. Of the nine calves that were stolen, seven were tagged and registered with the Holstein Association. Holstein tags and the distinctive holes they make are rare, O’Hara opined. No other cattle in the area bore such tags.
 

 After calling local livestock markets, authorities learned that appellant had sold seven calves at the Belleville market within twenty-four hours of the theft of O’Hara’s calves. They further learned that he had visited O’Hara’s farm on two occasions and had, each time, expressed an interest in purchasing some of O’Hara’s calves. But no such sale had ever occurred, nor had O’Hara ever authorized appellant to sell his calves.
 

 Advised that one of his calves may have been sold to Glick at the Belleville Market on January 23, 2002, O’Hara went to Glick’s Pennsylvania farm to see if the purchased calf was his. Before O’Hara arrived, Glick instructed his son to take O’Hara to the pen where the calf was being housed with six or eight other heifers, but not to tell O’Hara which calf Glick had just purchased. When O’Hara was nonetheless able to identify the newly-purchased calf, Glick permitted O’Hara to take the calf back to his farm in Frederick.
 

 Some of the calves that appellant brought to the auction on January 23, 2002, were sold to Diehl. On that day, Diehl paid a total of $1,250 for three calves. When O’Hara learned of this transaction, he went to Diehl’s farm. There, he recognized three of the calves as his own. All three calves had distinctive holes in their ears where O’Hara’s round button tags had been. O’Hara was also able to later identify a calf that appellant had sold to an Amish farmer at auction on January 23, 2002.
 

 When Pennsylvania authorities subsequently searched appellant’s Pennsylvania farm, O’Hara accompanied them and identified four more calves as his. These calves also had the telltale ear holes. By performing blood tests on the retrieved calves, the Holstein Association was able to confirm that some of those calves were indeed O’Hara’s.
 

 
 *9
 
 Joshua Yoder testified at trial that he transported calves from appellant’s farm to auction “a few times,” and confirmed that he did so in the middle of January. Yoder reported that appellant claimed he had raised the calves himself. That claim, Yoder thought, was “unusual.” There were not “that many matured cattle around,” Yoder explained, “that [appellant] could grow that many calves in that short of time from that amount of matured cattle.” Yoder also testified that appellant had a truck capable of transporting calves.
 

 The State charged appellant in the District Court in Frederick County with two counts of felony theft, two counts of unauthorized use of livestock, and one count of felony theft by scheme. At that time, appellant was imprisoned in Fulton County, Pennsylvania. After waiving extradition, appellant returned to Maryland to face the pending Maryland charges.
 

 At trial, the circuit court granted appellant’s motion for judgment of acquittal on the unauthorized use of livestock charges, but allowed the remaining charges to go to the jury. The jury convicted appellant of two counts of felony theft and one count of felony theft by continuing scheme.
 

 Before sentencing, appellant was released to Pennsylvania authorities to face unrelated criminal charges in Mifflin County, Pennsylvania, but Maryland lodged a detainer against appellant in Mifflin County to assure that he would be returned to Maryland for sentencing. A week later, he was. Upon his return to Maryland, appellant moved to dismiss the charges against him, arguing that Maryland violated the IAD, CSA §§ 8-402 to 8-411. Stating that it “did not think dismissal of the charges is a remedy here in Maryland if there are any violations [of the IAD]” the circuit court denied appellant’s request and sentenced him to a term of fifteen years’ imprisonment.
 

 Discussion
 

 I
 

 Appellant contends that the circuit court erred in failing to instruct the jury on territorial jurisdiction. He
 
 *10
 
 argues that the circuit court “should have told the jury that in order to convict the State must prove beyond a reasonable doubt that [appellant] came to Maryland and that in Maryland he took and carried away the calves.” The premise of appellant’s argument is correct that the jury must be instructed as to jurisdiction, but not the conclusion—that the instruction was not given.
 

 The circuit court, at appellant’s request, gave the following supplemental instruction to the jury:
 

 Now ladies and gentlemen, in outlining the elements of each crime, each crime must have been committed in Frederick County. I don’t know if I mentioned that. But because we are talking about—sometimes we talked about West Virginia and sometimes Pennsylvania—Maryland has no jurisdiction to do anything about charges that committed, were committed in either Pennsylvania or West Virginia. That’s up to them. In this particular case the Defendant is charged with two thefts and you must find that they occurred in Frederick County in the last, the scheme also.
 

 Thus, contrary to appellant’s claim, the court did instruct the jury on territorial jurisdiction.
 

 II
 

 Appellant contends that there was insufficient evidence to sustain his theft convictions. He maintains that there was “no evidence that he was in the State of Maryland at the time [of] the alleged crime” or that he engaged in “any scheme.”
 

 In reviewing the sufficiency of the evidence presented, as appellant has requested we do, we consider “the evidence in the light most favorable to the prosecution.”
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 accord State v. Smith,
 
 374 Md. 527, 533, 823 A.2d 664 (2003);
 
 Moye v. State,
 
 369 Md. 2, 12, 796 A.2d 821 (2002);
 
 Galloway v. State,
 
 130 Md.App. 89, 99, 744 A.2d 1070 (2000),
 
 aff'd,
 
 365 Md. 599, 781 A.2d 851 (2001),
 
 cert. denied,
 
 535 U.S. 990, 122 S.Ct. 1547, 152 L.Ed.2d 472 (2002). We then determine whether, based on that evidence,
 
 “any
 
 rational trier of
 
 *11
 
 fact could have found the essential elements of the crime beyond a reasonable doubt.”
 
 Jackson,
 
 443 U.S. at 319, 99 S.Ct. 2781;
 
 accord Smith,
 
 374 Md. at 533, 823 A.2d 664;
 
 Moye,
 
 369 Md. at 12, 796 A.2d 821;
 
 Galloway,
 
 130 Md.App. at 99, 744 A.2d 1070. The test is “ ‘not whether the evidence
 
 should have or probably would have
 
 persuaded the majority of fact finders but only whether it
 
 possibly could have
 
 persuaded
 
 any
 
 rational fact finder.’ ”
 
 Mora v. State,
 
 123 Md.App. 699, 727, 720 A.2d 934 (1998),
 
 aff'd on other grounds,
 
 355 Md. 639, 735 A.2d 1122 (1999) (quoting
 
 Fraidin v. State,
 
 85 Md.App. 231, 241, 583 A.2d 1065 (1991)).
 

 When we apply that test, we consider circumstantial as well as direct evidence. In fact, circumstantial evidence alone is “sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused.”
 
 Hall v. State,
 
 119 Md.App. 377, 393, 705 A.2d 50 (1998). We stress this latter point because the evidence presented in this case is almost entirely circumstantial, but it nonetheless presents a persuasive, if not compelling case, of appellant’s guilt.
 

 Indeed, after reviewing the evidence in a light most favorable to the prosecution, we conclude that there was sufficient evidence for the jury to find him guilty, as it did, of two counts of theft and one count of theft by scheme. We reach this conclusion by first considering the elements of the crimes for which appellant was convicted. We begin with theft, as that crime is itself an element of the more complex crime of theft by continuing scheme, of which appellant was also convicted.
 

 Appellant was convicted of two counts of theft under Md. Code (1957, 1996 RepLVol.), Art. 27 § 342(a).
 
 [2]
 
 That section states:
 

 A person commits the offense of theft when he willfully or knowingly obtains control which is unauthorized or exerts
 
 *12
 
 control which is unauthorized over property of the owner, and:
 

 (1) Has the purpose of depriving the owner of the property; or
 

 (2) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or
 

 (3) Uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.
 

 Id.
 

 “It has long been established in Maryland that, absent a satisfactory explanation, exclusive possession of recently stolen goods permits the drawing of an inference of fact strong enough to sustain a conviction that the possessor was the thief....”
 
 Anglin v. State,
 
 244 Md. 652, 656, 224 A.2d 668 (1966);
 
 see also Grant v. State,
 
 318 Md. 672, 680, 569 A.2d 1237 (1990) (“Ordinarily, the unexplained, exclusive possession of recently stolen goods permits an inference that the possessor is the thief.”). To prove possession, the prosecution need not show that the accused had “actual manual possession” of the stolen goods but only that he or she had “a measure of control or dominion over [them]”.
 
 Gamble v. State,
 
 2 Md.App. 271, 275, 234 A.2d 158 (1967). And possession is “exclusive” when “it is shown that the possession was personal and involved a distinct and conscious assertion of possession by the exercise of complete dominion and right of disposal.”
 
 Butz v. State,
 
 221 Md. 68, 78, 156 A.2d 423 (1959). In this instance, appellant had exclusive possession of the recently stolen calves.
 

 The evidence adduced at trial established that Holstein calves were stolen first from the Noffsinger farm and then a week later from the neighboring O’Hara farm; that both thefts occurred the day before the weekly Belleville market auction; that appellant showed up at the auction, the day after each theft, with Holstein calves; that he gave an implausible explanation to two different people of how he came into
 
 *13
 
 possession of the calves; that some of the calves purchased from appellant by Messrs. Diehl and Glick were later identified as the calves that had been stolen from the Noffsinger and O’Hara farms; and that no credible explanation was offered at trial as to how appellant came into possession of the calves.
 

 Contrary to appellant’s contention, the jury could have reasonably concluded from the evidence presented that appellant had exclusive possession of the stolen calves shortly after they had been stolen. That Yoder may have transported the calves, at appellant’s request, to the Belleville market, or that the market’s employees may have taken possession of the calves to sell them does not, as appellant maintains, cast doubt on the State’s claim that appellant had exclusive possession of the stolen calves. Yoder and the employees of the Belleville market were, the jury could have found, acting as agents of appellant when they took possession of the calves. Moreover, from the thefts of the calves to their sale, appellant repeatedly represented that he owned the calves and had the right to dispose of them, which he did by selling them.
 

 Furthermore, the evidence showed that appellant was in possession of the calves less than twenty-four hours after their disappearance. Maryland’s appellate courts have held that an accused can be found to be in possession of “recently stolen goods” even if he or she is found to be in possession of those goods weeks,
 
 e.g., Jones v. State,
 
 5 Md.App. 180, 185, 245 A.2d 897 (1968) (defendant possessed recently stolen goods when he was found with a handgun three weeks after it had been stolen), or even months after they were stolen.
 
 E.g., Cason v. State,
 
 230 Md. 356, 358, 187 A.2d 103 (1963) (defendant possessed recently stolen goods when he was found with a stolen radio over four months after it had been stolen);
 
 Gamble,
 
 2 Md.App. at 275-76, 234 A.2d 158 (defendant possessed recently stolen goods when he was found with stolen stock certificates about six months after they had been stolen).
 

 Once the State presented evidence that appellant was in exclusive possession of recently stolen goods, it was appel
 
 *14
 
 lant’s burden to provide a “reasonable explanation” of how he came into possession of them.
 
 Graham,
 
 6 Md.App. at 463, 251 A.2d 616. (“The law is clear that recent, exclusive possession of stolen goods creates an inference of fact that the possessor was the thief or the burglar and casts upon [appellant] the burden to give a reasonable explanation of how he came into such possession.”) But appellant did not testify at trial. Instead, the defense presented the testimony of his father, Robert Painter Sr.
 

 Painter, Sr. testified that a man known only as “Jason” arrived unannounced at his farm the month that the calves were stolen and offered to sell him some calves. He claimed that he purchased a total of seventeen calves from Jason on two occasions, but could not produce a receipt or any other documentation of the sale, or even provide Jason’s last name. He further testified that he mixed the newly-purchased calves with his other calves and that appellant took the newly-purchased calves to auction. All of this, he stated, occurred on two occasions, each time within twenty-four hours of the thefts. That the jury chose to discount this testimony generated, we are confident, neither error nor surprise. In sum, there was ample evidence from which the jury could conclude that the calves had been stolen and that appellant was the thief.
 

 Appellant’s contention that “there was no evidence of a scheme” to support appellant’s conviction for theft by continuing scheme is also without merit. Appellant was convicted of that offense pursuant to former Md.Code (1957, 1996 Repl. VoL), Art. 27 § 340(n)(5).
 
 [3]
 
 It stated:
 

 When theft is committed in violation of this subheading pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the value of the property
 
 *15
 
 or services aggregated in determining whether the theft is a felony or a misdemeanor.
 

 The purpose of this provision, as this Court has said, “is to permit the State to aggregate the value of all property stolen pursuant to one scheme or continuing course of conduct to determine whether the theft is a misdemeanor or felony.”
 
 State v. Hunt,
 
 49 Md.App. 355, 360, 432 A.2d 479 (1981). “[WJhether or not there [is] present in a particular case the requisite single continuous intent, scheme, or plan which would render a series of takings a single larceny is a question to be determined by the trier of fact.” Peter G. Guthrie,
 
 Series of Takings Over a Period of Time as Involving Single or Separate Larcenies,
 
 53 A.L.R.3d 398 § 6 (1973);
 
 see also Horsey v. State,
 
 225 Md. 80, 83, 169 A.2d 457 (1961).
 

 In this case, there was sufficient evidence for the jury to reasonably conclude that appellant’s two separate thefts constituted one scheme or course of conduct. Appellant stole four Holstein calves from the Noffsinger farm during the night or early morning hours. All of the calves were less than two months old. Less than twenty-four hours later, he sold the calves at Belleville Livestock Market auction.
 

 One week later, appellant stole nine Holstein Heifer calves from the neighboring O’Hara farm. As he did with Noffsinger’s calves, appellant sold the calves at the Belleville Livestock Market auction the next day. Both thefts involved calves that were essentially the same breed, size, and age. On both occasions, appellant hired Yoder to transport the calves from appellant’s farm to the Belleville market. These separate thefts involved the same subject matter, the same
 
 modus operandi,
 
 the same perpetrator, and the same geographic area. And they occurred within a week of each other. In short, the evidence of “one scheme or continuing course of conduct” was compelling.
 

 Ill
 

 Appellant contends that the charges against him should be dismissed with prejudice because the State violated two provi
 
 *16
 
 sions of the IAD: Article III and Article IV. He maintains that his release to Pennsylvania after his Maryland trial, but before sentencing, violated the “anti-shuffling” provision of Article III and that his return to Maryland one week after Maryland lodged a sentencing detainer in Pennsylvania violated the “30-day” rule of Article IV.
 

 The IAD is a Congressionally-sanctioned interstate compact that has been enacted in almost all states and territories of the United States, including both Maryland and Pennsylvania.
 
 See
 
 CSA §§ 8-402 to 8-411; 42 Pa.C.S.A. § 9101 (1998). The impetus for the Agreement was the “finding] that charges outstanding against a prisoner, detainers
 
 [4]
 
 based on untried indictments, informations, or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation.” CSA § 8-403 (Article I). “[T]o encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on
 
 untried indictments, informations, or complaints,” id.,
 
 the Agreement “ ‘prescribes the methods and procedures by which one jurisdiction may obtain temporary custody of an inmate imprisoned in another jurisdiction for purposes of trial on detainers based on untried indictments, information or complaints pending in the requesting jurisdiction.’ ”
 
 State v. Jefferson,
 
 319 Md. 674, 678-79, 574 A.2d 918 (1990) (quoting
 
 Clipper v. State,
 
 295 Md. 303, 305-06, 455 A.2d 973 (1983)).
 

 But the IAD applies only to persons who are the subject of a detainer lodged in the sending state and have “entered upon a term of imprisonment in a penal or correctional institution.” CSA § 8-405(a) (Article 111(a));
 
 see
 
 CSA
 
 *17
 
 § 8-406(a) (Article IV(a)). It does not apply to those in pretrial confinement, awaiting a disposition of their charges.
 
 Davidson v. State,
 
 18 Md.App. 61, 67-68, 305 A.2d 474 (1973);
 
 accord United States v. Muniz,
 
 1 F.3d 1018, 1026 (10th Cir.1993);
 
 United States v. Castor,
 
 937 F.2d 293, 296 (7th Cir.1991);
 
 United States v. Currier,
 
 836 F.2d 11, 16 (1st Cir.1987);
 
 United States v. Reed,
 
 620 F.2d 709, 711 (9th Cir.1980);
 
 United States v. Milhollan,
 
 599 F.2d 518, 528 (3d Cir.1979);
 
 United States v. Harris,
 
 566 F.2d 610, 613 (8th Cir.1977);
 
 United States v. Roberts,
 
 548 F.2d 665, 671 (6th Cir.1977). And that limitation is consistent with the point of the Agreement. As the United States Court of Appeals for the Ninth Circuit stressed in
 
 Reed,
 
 620 F.2d at 711 (quoting
 
 United States ex rel. Esola v. Groomes,
 
 520 F.2d 830, 836-37 (3d Cir.1975)), the purpose of the IAD is “ ‘to minimize the adverse impact of a foreign prosecution on rehabilitative programs of the confining jurisdiction.’ ” As a pretrial detainee has little or no interest in any of the rehabilitative programs of the institution, in which he is being temporarily detained pending trial, there is no basis to justify invoking the IAD.
 
 Id.; Milhollan,
 
 599 F.2d at 528;
 
 Harris,
 
 566 F.2d at 613.
 

 When appellant was transferred from Pennsylvania to Maryland he was not serving a prison sentence; nor was he, when, before his Maryland sentencing hearing, he was sent back to Pennsylvania to resolve some pending charges there. Nor was he incarcerated for that purpose when he was returned to Maryland a week later for sentencing. Consequently, neither the IAD in general nor Articles III or IV in particular apply to any of appellant’s interstate shuttles.
 

 There are, however, more specific grounds upon which to reject appellant’s claims that Article III and IV require the reversal of his convictions. We shall discuss those grounds to dispose of appellant’s remaining claims, to illuminate this murky statute, and to provide some guidance should such claims arise again.
 

 We begin by stating what appellant does not challenge. He does not attack his first interstate transfer: his
 
 *18
 
 transfer from Pennsylvania to Maryland for trial on the charges in this case. That transfer occurred after appellant waived extradition, and, more important, the transfer was not pursuant to a detainer. It therefore did not fall within the purview of the IAD.
 
 See United States v. Mauro,
 
 436 U.S. 340, 361, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978). And appellant wisely chose to direct his ire elsewhere.
 

 It is the two transfers that followed his initial transfer to Maryland that appellant questions. He charges that when Maryland released him to Pennsylvania, before his sentencing hearing, it violated the anti-shuffling provision of Article III and that when Pennsylvania later released him to Maryland for that hearing, it violated the “30-day” rule of Article IV.
 

 A. The Anti-Shuffling Provision
 

 Preliminarily, we note that the IAD contains two anti-shuffling provisions: Article 111(d) and Article IV(e). In fact, the articles contain almost identical mandatory dismissal provisions.
 
 [5]
 
 The principal difference between them is that Article III is concerned with prisoner-initiated procedures for disposing of pending charges while Article TV is concerned with prosecutorial efforts to dispose of such charges. As appellant agreed to waive extradition and voluntarily return to Maryland to dispose of pending charges here, he invokes the anti-shuffling provision of Article III.
 

 
 *19
 
 Article III of the IAD provides that when a detainer is lodged against a prisoner, that prisoner may demand a speedy disposition of the charges upon which the detainer was lodged.
 
 See
 
 CSA § 8-405(a) (Article 111(a));
 
 Stone v. State,
 
 344 Md. 97, 109, 685 A.2d 441 (1996). Once that demand is made, the prisoner must be brought to trial in the receiving state within 180 days. CSA § 8-405(a) (Article 111(a)). The arrival of the prisoner in the receiving state then triggers the “anti-shuffling” provision or “single transfer rule.”
 
 Jefferson,
 
 319 Md. at 680, 574 A.2d 918;
 
 Bunting v. State,
 
 80 Md.App. 444, 448, 564 A.2d 109 (1989). That provision states:
 

 Any request for final disposition made by a prisoner under [Article 111(a) ] shall operate as a request for final disposition of all untried indictments, informations, or complaints on the basis of which detainers have been lodged against the prisoner from the state to whose prosecuting official the request for final disposition is specifically directed.
 

 CSA § 8-405(d) (Article 111(d)). It further states:
 

 If trial is not had on any indictment, information, or complaint contemplated hereby prior to the return of the prisoner to the original place of imprisonment, the indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.
 

 Id.
 
 “[That] provision has been interpreted as intending to ‘limit the jurisdictional transfer of prisoners by requiring [the accusing jurisdiction] . .. [to] wrap up its business with [the prisoner], so to speak, before returning him to the custodial [jurisdiction]’ ” or face dismissal of its charges.
 
 Jefferson,
 
 319 Md. at 680, 574 A.2d 918 (quoting
 
 Boyd v. State,
 
 51 Md.App. 197, 203, 441 A.2d 1133,
 
 aff'd,
 
 294 Md. 103, 447 A.2d 871 (1982)). And that, appellant claims, did not occur here.
 

 Maryland’s decision to release him to Pennsylvania before it imposed sentence constitutes, appellant maintains, a failure by Maryland to “wrap up its business with [him]” by finishing his trial, “before returning him” to Pennsylvania. That failure, he insists, means that he, in effect, never had a “trial,” as
 
 *20
 
 required by the IAD, on his Maryland charges before his return to Pennsylvania. Therefore, his Maryland convictions should be vacated, he argues, as they fall within the category of “untried indictments, informations, or complaints” under the anti-shuffling provision of Article III.
 

 But the term “trial” in Article III, as well as in Article IV, does not encompass sentencing. If it did, then the anti-shuffling provision of Article III, as well as of Article IV, would have addressed, we can assume, unsentenced convictions, as it does “untried indictments, informations, or complaints.” It does not, and thus we conclude that a “trial”, for the purposes of the IAD, refers to the resolution of charges and not necessarily to the imposition of sentence.
 

 Moreover, to extend the anti-shuffling provision, from requiring the “dismissal” of untried charges to mandating the vacation of lawful convictions, as appellant urges us to do, because the prisoner was returned to “the original place of imprisonment,” after conviction but before sentencing, violates a fundamental canon of statutory construction: the rule of
 
 casus omissus.
 
 That rule prohibits us from supplying what an act omits, lest we invade the province of the legislature.
 
 Rogan v. Balto. & Ohio R.R. Co.,
 
 188 Md. 44, 54, 52 A.2d 261 (1947). Thus, the anti-shuffling provision of Article III, contrary to appellant’s claim, provides no basis upon which to overturn his convictions.
 

 And finally, our view that returning a prisoner to the sending state, after trial but before sentencing, does not violate the “anti-shuffling” provisions of the IAD is shared by an overwhelming majority of state and federal courts that have considered this issue.
 
 See United States v. Coffman,
 
 905 F.2d 330, 333 (10th Cir.1990);
 
 People v. Barnes,
 
 93 Mich.App. 509, 287 N.W.2d 282, 283-84 (1980);
 
 People v. Housewright,
 
 83 Mich.App. 346, 268 N.W.2d 401, 403 (1978);
 
 State v. Lewis,
 
 422 N.W.2d 768, 772 (Minn.Ct.App.1988);
 
 State v. Miller,
 
 277 N.J.Super. 122, 649 A.2d 94, 96 (App.Div.1994);
 
 People v. Dalsheim,
 
 110 Misc.2d 734, 442 N.Y.S.2d 906, 907 (N.Y.Sup.Ct.1981).
 

 
 *21
 
 But there is one appellate court that has staked out a contrary position. Pointing out “that the term ‘trial’ in the speedy trial clause of the Sixth Amendment to the United States Constitution has been construed to include sentencing,” the United States Court of Appeals for the Ninth Circuit, in
 
 Tinghitetta, v. California,
 
 718 F.2d 308, 311 (9th Cir.1983), opined that “the terms ‘trial’ and ‘final disposition’ encompass sentencing” and thereby extended the phrase “untried indictment, information or complaint” to encompass unsentenced convictions. We note, however, that
 
 Tinghitetta
 
 was rendered before the Supreme Court’s decision in
 
 Carchman v. Nash,
 
 473 U.S. 716, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985). Holding that a probation violation hearing does not fall within the purview of the IAD, the Supreme Court declared, in that case, that the phrase “untried indictment, information or complaint” in Article III
 
 [6]
 
 refers to “criminal charges pending,”
 
 id.
 
 at 725, 105 S.Ct. 3401, and thereby implied that it did not apply to unsentenced convictions.
 

 tí. The, 30-Day Rule,
 

 Appellant also contends that the “30-day” provision of Article IV of the IAD was violated when Pennsylvania released him to Maryland less than thirty days after Maryland lodged a detainer in Pennsylvania seeking his return for sentencing. That provision provides:
 

 The appropriate officer of the jurisdiction in which an untried indictment, information, or complaint is pending shall be entitled to have the prisoner against whom the officer has lodged a detainer and who is serving a term of imprisonment in any party state made available in accordance with § 8-407(a) of this subtitle (Article V(a) of the [IAD]) upon presentation of a written request for temporary custody or availability to the appropriate authorities of
 
 *22
 
 the state in which the prisoner is incarcerated; provided that the Court having jurisdiction of the indictment, information, or complaint shall have duly approved, recorded, and transmitted the request;
 
 and provided further that there shall be a period of SO days after receipt by the appropriate authorities before the request be honored, within which period the governor of the sending state may disapprove the request for temporary custody or availability either upon the governor’s own motion or upon motion of the prisoner.
 

 CSA § 8-406(a) (Article IV(a)) (emphasis added).
 

 In sum, Article IV of the LAD applies only to detainers lodged against a prisoner based on an “untried indictment, information, or complaint.”
 
 See
 
 CSA § 8-406(a) (Article LV(a)). It “allows the prosecutor in the state where the charges are pending to initiate proceedings and secure the defendant’s presence for trial.”
 
 Stone,
 
 344 Md. at 109, 685 A.2d 441;
 
 see
 
 CSA § 8-406(a) (Article IV(a)). When the sending state receives such a request from the prosecutor, “there shall be,” according to that article, “a period of 30 days after receipt by the appropriate authorities before the request [is to] be honored, within which period the governor of the sending state may disapprove the request ... either upon the governor’s own motion or upon motion of the prisoner.” CSA § 8-406(a) (Article IV(a)). If, after the thirty day period, the governor in the sending state agrees to release the prisoner to the receiving state, the sending state shall then commence the trial on the charges within 120 days. CSA § 8-406(c) (Article IV(c)).
 

 Because he was returned to Maryland for sentencing before that thirty day period had passed, appellant claims that his transfer back to Maryland for sentencing violated the IAD and that therefore his Maryland convictions should have been vacated. But appellant provides no authority for the proposition that Maryland should dismiss its charges or, in this instance, vacate lawful convictions, because Pennsylvania may not have fully complied with this time requirement.
 

 
 *23
 
 Moreover, for the same reasons that releasing a prisoner to the sending state, after conviction but before sentencing in the receiving state, does not violate the anti-shuffling provisions of the IAD, we hold that sentencing detainers do not fall within the purview of the IAD. From our earlier holding in this opinion that the term “trial” in the IAD does not encompass sentencing, it follows that the IAD would also not encompass detainers to secure prisoners for that purpose.
 

 In so holding, we join many other state and federal courts that have reached the same conclusion. As the Court of Appeals of Arizona stated in
 
 State v. Burkett,
 
 179 Ariz. 109, 876 P.2d 1144, 1146 (Ct.App.1993), “[njearly all jurisdictions that have considered whether the IAD applies to sentencing detainers have concluded that it does not.”
 
 See also Stephenson v. State,
 
 801 So.2d 34, 40 (Ala.Crim.App.2000);
 
 People v. Castoe,
 
 86 Cal.App.3d 484, 150 Cal.Rptr. 237, 239 (1978);
 
 Moody v. Corsentino,
 
 843 P.2d 1355, 1372 (Colo.1993);
 
 Bogue v. Fennelly,
 
 705 So.2d 575, 581 (Fla.Dist.Ct.App.1997);
 
 State v. Miller,
 
 134 Idaho 458, 4 P.3d 570, 575 (Ct.App.2000);
 
 Lancaster v. Stubblefield,
 
 985 S.W.2d 854, 856 (Mo.Ct.App.1998);
 
 Prince v. State,
 
 118 Nev. 634, 55 P.3d 947, 950-51 (2002);
 
 State v. Sparks,
 
 104 N.M. 62, 716 P.2d 253, 256 (Ct.App.1986);
 
 People v. Randolph,
 
 85 Misc.2d 1022, 381 N.Y.S.2d 192, 194 (N.Y.Sup.Ct.1976);
 
 State v. Barnes,
 
 14 Ohio App.3d 351, 471 N.E.2d 514, 516 (Ct.App.1984);
 
 State v. Leyva,
 
 906 P.2d 910, 912 (Utah Ct.App.1995);
 
 State v. Borefield,
 
 110 Wash.2d 728, 756 P.2d 731, 734 (1988);
 
 State v. Grzelak,
 
 215 Wis.2d 577, 573 N.W.2d 538, 541 (Ct.App.1997).
 

 The policy underlying the distinction we draw today, and that other courts have drawn before us, between “trial” and “sentencing” detainers is sound. As the Court of Appeals of Michigan observed in
 
 Housewright,
 
 268 N.W.2d at 403: “The uncertainty caused by the delay in sentencing is minimal when compared with uncertainty resulting from untried charges.”
 
 See also Moody,
 
 843 P.2d at 1371;
 
 Barnes,
 
 287 N.W.2d at 283.
 

 JUDGMENT AFFIRMED.
 

 COSTS TO BE PAID BY APPELLANT.
 

 [1]
 

 . A "Holstein” cow is a particular breed of cattle, known
 
 for its
 
 distinctive black and white markings and outstanding milk production. Holstein Association USA,
 
 Characteristics of Holsteins, at
 
 http://www.holsteinusa.com.
 

 [2]
 

 . This provision has since been re-codified and is now Md.Code (2002), § 7-104(a) of the Criminal Law Article.
 

 [3]
 

 . This provision has since been re-codified and is now Md.Code (2002), § 7—103(f) of the Criminal Law Article.
 

 [4]
 

 . Interesting enough, the IAD does not define what a "detainer” is. For that definition, we must turn to the Court of Appeals. It defines a "detainer” as " 'a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.’ ”
 
 Stone v. State,
 
 344 Md. 97, 108, 685 A.2d 441 (1996) (quoting
 
 State v. Jefferson,
 
 319 Md. 674, 678, 574 A.2d 918 (1990)).
 

 [5]
 

 . CSA § 8-405(d) (Article 111(d)) states:
 

 If trial is not had on any indictment, information, or complaint contemplated hereby prior to the return of the prisoner to the original place of imprisonment, the indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.
 

 CSA § 8-406(e) (Article IV(e)) states:
 

 If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment ..., the indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the indictment, information, or complaint with prejudice.
 

 [6]
 

 . Although
 
 Carchman
 
 was decided in the context of Article III, it is equally instructive in cases arising under Article IV, as both articles apply to "any untried indictment, information, or complaint.”
 
 Compare
 
 CSA § 8-405(a) (Article 111(a)),
 
 with
 
 CSA § 8-406(a) (Article IV(a)).