878 A.2d 711

**Lawrence Lambert DYSON**

v.

**STATE of Maryland.**

**No. 2579, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

July 13, 2005.

Brian M. Saccenti, Philip A. Rocca * (Nancy S. Forster, Public Defender, on the brief), Baltimore, for appellant.

Stephen H. Chaikin (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee.

Panel: DEBORAH S. EYLER, KRAUSER and LAWRENCE F. RODOWSKY (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

A jury in the Circuit Court for Howard County convicted Lawrence Lambert Dyson, Jr., the appellant, on one count of felony theft scheme of property valued over $500 and on three counts of misdemeanor theft of property valued at less than

---

* Law Student Admitted pursuant to Rule 16.

$500. The court sentenced the appellant to a 10–year term for the felony theft scheme conviction and to 18–month consecutive terms for each misdemeanor conviction, all to be served concurrently to the felony theft scheme sentence.

On appeal, the appellant presents two questions for review:

"I. Did the trial court err by admitting a hearsay statement which unduly prejudiced appellant?

II. Did the trial court err by failing to merge the convictions and sentences?"

For the reasons set forth below, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

On December 20, 2002, the appellant, a woman named "Tam," a woman named "Ebony," and a man whose name is not disclosed in the record drove to Michelle Wetmore's apartment in Columbia.[1] Ebony remained in the car while the other three met with Wetmore inside her apartment. Tam asked Wetmore if she "wanted to make some money." Wetmore responded, "Yeah," and left with the three. They all got in the car with Ebony, with the unnamed man at the wheel, and drove to the Patuxent Medical Group ("PMG") building, also in Columbia, where they parked nearby.

The appellant entered the lobby of the building. He took the elevator to the third floor and then walked down a hallway to the gynecology department, and entered. He walked through the gynecology department, entering the offices of three gynecology department employees: Janet Carletto, Victoria Hendrickson, and Kimberly Guldan. Carletto's and Hendrickson's offices were next to each other, and Guldan's office was one office over from Hendrickson's.

All three women were away from their offices at lunch, but had left their purses behind. Carletto's purse was behind a chair, by the edge of her desk; Hendrickson's purse was

---

1. The last names of Ebony and Tam do not appear in the record either.

halfway underneath her desk, behind another bag; and Guldan's purse was in a drawer in her desk. The appellant went into each woman's purse and took credit cards. He took five credit cards from Carletto, three credit cards from Hendrickson, and one credit card from Guldan. About ten minutes after first entering the gynecology department, the appellant returned to the elevator, rode back down to the first floor lobby, and returned to the car.

The appellant showed the stolen credit cards to the occupants of the car. The group drove to a gas station, where the appellant tested the credit cards at the pump to confirm that they were valid. The group then drove to various retail stores around Howard County, including Target stores in Columbia and Ellicott City, a Wal-mart in Ellicott City, a CompUSA in Columbia, and a Rack Room Shoes in Columbia. The appellant gave Wetmore two of the credit cards, and told her to "just go get Play Station II's." Before using the cards, Wetmore checked the signatures so she could imitate them. Wetmore, Tam, and Ebony used the credit cards the appellant gave them to make purchases at the stores. The appellant did not enter the stores. At the Target in Ellicott City, he assisted in loading the store purchases into the car.

The three women charged a total of $3,257.62 in merchandise using Carletto's credit cards and $1,249.35 in merchandise using Hendrickson's credit card.[2]

After making the purchases, the group drove to a pawn shop in Baltimore City. The appellant pawned the items

---

2. The exact breakdown of charges is as follows: $662.30 from Wal-mart in Ellicott City and $1554.51 from Target in Columbia using one of Carletto's credit cards; $730.10 from Wal-mart in Ellicott City, $258.22 from Target in Ellicott City, and $52.49 from Rack Room Shoes using another of Carletto's credit cards; and $629.93 from Target in Ellicott City and $619.42 from CompUSA using Hendrickson's credit card. The purchases included several Play Station IIs, women's underwear, clothes, a telephone, and a phone card.

 Guldan realized around 3:30 or 4:00 p.m. that day that her credit card had been stolen. She immediately contacted the credit card company and canceled the card. Carletto and Hendrickson did not realize until that evening that their credit cards had been stolen.

purchased at the retail stores for cash. He gave Wetmore $300 of the cash he received for the items.

The police were able to identify Wetmore after viewing a surveillance tape from one of the retail stores. She was arrested on January 8, 2003. She gave oral and written statements to Howard County Police Officer James Daly, implicating the appellant, whom she knew by the nickname "the rabbit."

A statement of 31 charges was filed against the appellant on January 11, 2003. Before trial, the State *nol prossed* all but four charges against the appellant. Three of the remaining charges were for misdemeanor theft under Md.Code (2002), section 7–104 of the Criminal Law Article ("CL"), one each for stealing a credit card (or cards) from each victim. The fourth remaining charge was for felony theft scheme, under CL sections 7–103 and 7–104, for, "pursuant to one scheme and continuing course of conduct, steal[ing] MERCHANDISE of TARGET, SHOE RACK, COMP USA, [and] WALMART having a value of $500 or greater[.]" As noted, the appellant was convicted on all four charges.

We shall recite additional facts as pertinent to our discussion of the questions presented.

## DISCUSSION

### I.

At trial, the State called Wetmore as a witness. She testified that she knew the appellant from having "d[one] a credit card scheme with him." They had been introduced by a mutual friend.

Wetmore recounted the events of December 20, 2002, as we have recited them above.

On cross-examination, defense counsel questioned Wetmore about the written statement she had given to Officer Daly:

Q: Can I read to you what you wrote. You essentially told the officers that [the appellant] is the one who was responsible for all of this, correct?

A: Yes.

Q: And, what you wrote was a black male picks me up in the mornings, he goes around to different office buildings and goes in and makes an attempt to steal credit card[s] and brings them to the car. Then goes to check them at the gas station and that's to see if they work. And then goes to the stores and purchases thing[s] and take to the pawn shop, and then splits money with me on the profit we make. You didn't once in [here] say that you're the one in the store, making the charges, correct?

A: Okay.

Q: You took no responsibility whatsoever for these offenses, correct?

A: Yes, I did. I just didn't write it down.

Q: You never said I am the one who purchases things?

A: No, I didn't.

Q: You are the one who purchases the things, correct?

A: Not in the statement. I told them verbally, I didn't tell them in the statement. What's the point?

Q: But you didn't tell the truth right here. You're the one who purchases the items?

A: Okay.

On redirect examination, the prosecutor sought to have Wetmore clarify her responses to defense counsel's questions:

Q. When Ofc. Daly spoke to you, did he hand you that piece of paper and just ask you to give a statement? Was that the first thing he did?

A. No. He talked to me first.

Q. So you actually gave him an oral statement before you wrote something down?

A. Yes.

Q. And, did you admit your involvement in this credit card scheme?

A. Yes, I did.

Q. And, in fact, in this written statement you admitted that you guys split the profit, right?

A. Yes.

Officer Daly also was called as a State's witness. On direct examination, he testified that, after Wetmore was arrested, he "presented the evidence to her that was pretty substantial against her in the case[,]" and she "admitted she was involved." Officer Daly's testimony continued as follows:

Q: *And what, if anything, did she say as to her involvement?*

A: Well, she explained what had ... been going on with her involvement with this case was that she was approached by a black male who—

[DEFENSE COUNSEL]: Your Honor, I'm going to object at this point to hearsay.

THE COURT: All right, why don't you approach here.

(Counsel approached the Bench and the following ensued.)

THE COURT: Well, it is hearsay. You phrased the issue that badgered, induced, promised, threatened, to get a statement. So I think that opens the door to the State to present the entire nature of how the statement was given. So I'll overrule the objection.

\* \* \*

(Counsel returned to trial table and the proceedings continued in open court.)

[PROSECUTOR]: Ofc. Daly, you started to tell us about what Ms. Wetmore indicated as to what happened. Will you continue?

A: Yes, she informed me that she was approached by a black male who had an idea, for lack of a better word, so that she could make some money. That she was having some financial difficulty. She informed me that she would be picked up by this black male sometime in

the morning, after her husband left. I think that's what she indicated. Her husband wasn't aware of the situation, so it would always be around the same time in the morning, she'd get picked up.

At which time, the black male would drive to any of several different apartment, office type buildings. At which points the black male would go into [an] office building and come back out with credit cards. I think most if not all the time belonging to females.

Q: And, what did she indicate happened next?

A: Then the black male would give her the credit cards at which point she would, they would drive to stores and she would go in and make purchases on the credit cards. Some of the items the black male was specific as to what he wanted purchased and then I believe she was also allowed to buy some of her own items.

Q: And what, if anything, else did she indicate as to what happened?

A: Well, then they would take the items that that Black male had requested which [were] mostly electronic type items including Playstation II's. At which point the black man would drive to unknown pawn shop in Baltimore City and would go in and then come back out with cash and they would split the cash.

(Emphasis added.)

The appellant contends the trial court erred in permitting Officer Daly to testify about Wetmore's oral statement. He argues that Wetmore's statement was inadmissible hearsay that "d[id] not become admissible by virtue of the fact that defense counsel had previously asked about the manner in which the statement was given." The appellant further argues that the error in allowing Officer Daly to testify about Wetmore's oral statement was not harmless because Wetmore's credibility was a "seminal issue" in the case and the evidence tended to bolster her testimony.

The State responds that Officer Daly's testimony properly was admitted, although not for the reason given by the trial judge. Officer Daly's testimony about what Wetmore told him about her involvement in the theft scheme was a prior consistent statement admissible to rehabilitate Wetmore, under Rule 5–616(c)(2).

 It is ordinarily within the sound discretion of the trial court to determine the admissibility of evidence. *Fenner v. State,* 381 Md. 1, 25, 846 A.2d 1020 (2004); *Blair v. State,* 130 Md.App. 571, 592, 747 A.2d 702 (2000). We will not disturb a trial court's evidentiary ruling absent error or a clear abuse of discretion. *Young v. State,* 370 Md. 686, 720, 806 A.2d 233 (2002); *Behrel v. State,* 151 Md.App. 64, 126, 823 A.2d 696 (2003).

 Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Md. Rule 5–801. As this definition makes plain, whether an out-of-court statement is hearsay depends on the purpose for which it is offered at trial. *Stewart v. State,* 342 Md. 230, 236 n. 1, 674 A.2d 944 (1996); *Hardison v. State,* 118 Md.App. 225, 234, 702 A.2d 444 (1997). Subject to certain well-established exceptions, a hearsay statement offered to prove its truth is inadmissible. Md. Rule 5–802.

 Under Rule 5–616(c)(2), a prior consistent statement is admissible to rehabilitate a witness as long as the fact that the witness has made a consistent statement detracts from impeachment of the witness. *Holmes v. State,* 350 Md. 412, 427, 712 A.2d 554 (1998); *Blair, supra,* 130 Md.App. at 601, 747 A.2d 702. Prior consistent statements are not offered for their truth, and therefore are not hearsay. *Holmes, supra,* 350 Md. at 427, 712 A.2d 554.

*Holmes, supra,* is instructive. In that case, Ellouise Thompson testified on direct examination that she had witnessed the defendant shoot and kill her roommate. She also testified that she initially was reluctant to give any statement

to the police because the defendant knew she had witnessed the murder and she was frightened for her safety. On cross-examination, defense counsel impeached Thompson with a written statement she had given the police on the day of the shooting, in which she claimed not to have seen the assailant. On redirect examination, the prosecutor introduced, over objection, a second statement Thompson had given to the police two days later in which she identified the defendant as the assailant.

The Court of Appeals held that Thompson's second, consistent statement was admissible for rehabilitative purposes, under Rule 5–616(c)(2), because it "detracted from the impeachment by rebutting her initial inconsistent statement to police that she did not see who shot [her roommate]." 350 Md. at 428, 712 A.2d 554. Furthermore, the second statement "put to perspective that [Thompson's] inconsistent statement was made because she was frightened of what [the defendant] would do to her." *Id.*

■ In the present case, the critical question to Officer Daly, and the only one objected to, was "what, if anything, did [Wetmore] say as to her involvement" in the theft scheme? Officer Daly's testimony about Wetmore's oral statement to him was not being offered to prove the truth of the matter asserted—that is, Wetmore's involvement in the credit card scheme. Rather, the statement was being offered to rehabilitate Wetmore's credibility. Wetmore had testified on direct examination that she told Officer Daly of her participation in the theft scheme. The defense had impeached her on this point by showing that her written statement to Officer Daly did not say that she had participated in the scheme. Officer Daly's testimony was offered to detract from the impeachment by showing that Wetmore had told Officer Daly that she had participated in the scheme. Accordingly, Officer Daly's testimony about Wetmore's oral statement was not hearsay.

The trial court concluded that Officer Daly's testimony about Wetmore's statement was hearsay, but that it fell into an exception to the hearsay rule. As discussed above, Officer

Daly's testimony was not hearsay. Thus, to the extent that the trial judge erred, it was in finding that the statement was hearsay. However, the trial judge's evidentiary ruling was correct, that there was no basis for the objection and that the testimony was admissible. Accordingly, we find no abuse of discretion.

## II.

The appellant contends the trial court "erred by failing to merge the convictions and sentences." He makes two assignments of error. First, he argues that the trial court erred by not merging his three misdemeanor theft convictions into one conviction, under the single larceny doctrine. Second, he argues that the trial court erred by not merging the misdemeanor theft offenses into the felony theft scheme offense for sentencing because "they were part of the same theft scheme." We disagree with both arguments.

### (a)

The "single larceny doctrine" was a part of Maryland common law before 1978, when the consolidated theft statute was enacted, and remains part of Maryland's theft law. *State v. White*, 348 Md. 179, 195–96, 702 A.2d 1263 (1997). Under the doctrine, the stealing of several items at the same time, belonging to different people, ordinarily constitutes one offense. *Id.* at 183, 702 A.2d 1263; *State v. Warren*, 77 Md. 121, 122–23, 26 A. 500 (1893). *See also Govostis v. State*, 74 Md.App. 457, 471, 538 A.2d 338 (1988) (holding, in a different application of the doctrine, that the stealing of several articles, at the same time, from the same person, is one theft).

The rationale behind the single larceny doctrine is that "the act of taking is one continuous act or transaction, and since the gist of the offense is the felonious taking of property, the legal quality of the act is not affected by the fact that the property stolen belonged to different persons." *White, supra,* 348 Md. at 183, 702 A.2d 1263 (quoting Daniel H. White, *Single or Separate Larceny Predicated upon Stealing Proper-*

*ty from Different Owners at the Same Time,* 37 A.L.R.3d 1407, 1409 (1971)). The single larceny doctrine

> is premised on the notion that the defendant's conduct, of taking several items of property at one time, constitutes a single criminal act. That, in turn, rests on the notion that the separate takings are all part of a single larcenous scheme and a continuous larcenous act, and, when the evidence suffices to establish that fact, directly or by inference, most courts have had no problem applying the doctrine.

*White, supra,* 348 Md. at 188–89, 702 A.2d 1263. The Court in *White* held that the defendant in that case committed a single larceny when he entered an empty school office shared by four teachers and took a small television set belonging to one teacher and a canvas bag belonging to another teacher. *Id.* at 196, 702 A.2d 1263.

The Court in *White* observed that defining the single larceny doctrine is easier than determining when it applies. "[A]lthough '[t]he principles are easily stated and understood ... application of the doctrine becomes problematic when applied to the infinite variety of circumstances that can arise.' " *Id.* at 188, 702 A.2d 1263 (quoting *Richardson v. Commonwealth,* 25 Va.App. 491, 495, 489 S.E.2d 697 (1997)). When the facts show directly or by inference that "the defendant's conduct, of taking several items of property at one time, constitutes a single criminal act," the doctrine applies. *White, supra,* 348 Md. at 189, 702 A.2d 1263. *See also Commonwealth v. Donovan,* 395 Mass. 20, 29, 478 N.E.2d 727 (1985) (single larceny when defendants obtained money from several people on a single evening for a single period of time by placing a phony night deposit box on the wall of a bank); *State v. Waller,* 280 S.C. 300, 301, 312 S.E.2d 552 (1984) (single larceny when defendant broke into apartment and stole property belonging to three different people); *State v. Myers,* 407 A.2d 307, 309 (Me.1979) (single larceny when defendant broke into office and stole funds, from a single cash box, that belonged to three different entities); *Reader v. State,* 349 A.2d 745, 748 (Del.1975) (single larceny when defendant broke into

commercial building and stole property from three tenants); *Hearn v. State,* 55 So.2d 559, 561 (Fla.1951) (single larceny when defendant stole cows belonging to different people that were grazing in the same open range, in and around the same area, by rounding them up at the same time and placing them in one truck from the same loading pen); *State v. Sampson,* 157 Iowa 257, 259, 138 N.W. 473 (1912) (single larceny when defendant broke into room where two roommates were sleeping and stole items from each); *People v. Johnson,* 81 Mich. 573, 577, 45 N.W. 1119 (1890) (single larceny when defendant stole 35 bushels of wheat, belonging to one victim, from first floor of granary and three hams and a buffalo robe, belonging to a second victim, from the second floor of the same granary, at one time); *Richardson, supra,* 25 Va.App. at 498, 489 S.E.2d 697 (single larceny when defendant stole two purses from nurses' station, even though purses were separated by approximately ten feet and a wall; the thefts occurred at approximately the same time, from the same general area, and were pursuant to a single impulse or design to steal items from nurses' station); *People v. Fuentes,* 172 Ill.App.3d 874, 878, 122 Ill.Dec. 780, 527 N.E.2d 152 (1988) (single larceny when defendant broke into house and stole property belonging to different people from different rooms in house).

In *White,* the Court emphasized, however, that the single larceny doctrine does not apply "[w]here the facts clearly would have indicated that separate and distinct thefts were intended and accomplished." 348 Md. at 192 n. 5, 702 A.2d 1263.

In *State v. Cabbell,* 252 N.W.2d 451, 453 (Iowa 1977), for example, the court affirmed two theft convictions against a defendant who shoplifted goods from two stores in a mall. The defendant and a cohort were first seen at the Younkers store and later the same day were seen at the J.C. Penney store. When the defendant was arrested, at Penney's, she had goods from both stores in her possession. The court explained:

[I]t is well settled that if, on the same expedition, there are several distinct larcenous takings, as the taking of the goods

of one person at one place, and afterward the taking of the goods of another person at another place, and so on, as many crimes are committed as there are several and distinct takings, and this is true although the thefts may all have been committed in rapid succession and in pursuance of a formed design to steal.

*Id.* at 453 (quoting 50 Am.Jur.2d, *Larceny,* § 3, at 154–55 (1970)).

The *Cabbell* court held that the facts in evidence, showing different property owners, different locations of the thefts, and a lapse of time between incidents, supported the finding of separate larcenies. 252 N.W.2d at 453. *See also Hall v. State,* 66 So.2d 863, 864 (Fla.1953) (separate larcenies when defendant stole cattle from different owners and from different pastures, on the same day and in the same general vicinity, transporting the cattle in one motor truck); *State v. Maggard,* 160 Mo. 469, 472, 61 S.W. 184 (1901) (separate larcenies when defendant stole property belonging to different people from a number of wagons standing in different parts of the same wagon yard); *Nichols v. Commonwealth,* 78 Ky. 180 (1879) (separate larcenies when defendant stole fowls of one person from one place and fowls of another person from another place, 200 yards away, on same night within a short period of time); *Lasater v. State,* 734 P.2d 317, 318 (Okla. Crim.App.1987) (separate larcenies when defendant stole cows belonging to two different owners from two adjoining pastures separated by a fence).

In *Richardson, supra,* 25 Va.App. 491, 489 S.E.2d 697, in which the takings of two purses from a nursing station on the tenth floor of a hospital complex were held to constitute a single larceny, the court recognized that a series of thefts in rapid succession pursuant to a general scheme to steal from distinct locations, "such as different shops, stores or buildings, will constitute separate offenses." *Id.* at 497, 489 S.E.2d 697. There, the defendant also had stolen items from offices in two other buildings of the hospital complex, on the same day. His two additional theft convictions based on those takings were affirmed, upon a decision that they were separate offenses,

"even though they were in furtherance of the defendant's general scheme to steal." *Id.* at 494 n. 1, 489 S.E.2d 697. The court explained:

> When the evidence supports a finding that the thefts were part of the same larcenous impulse or scheme and were part of a continuous act, a single larceny has occurred. The primary factor to be considered is the intent of the thief and the question to be asked is whether the thefts, although occurring successively within a brief time frame, were part of one impulse. The circumstances to be considered that will bear upon the issue are the location of the items stolen, the lapse of time between their taking, the general and specific intent of the thief, the number of owners, and whether intervening events occurred between the takings. Unless the evidence proves that two or more separate and discrete thefts occurred at separate times which were not part of the same larcenous impulse, then thefts from the same room are but a single larceny.
>
> * * * * *
>
> [T]he controlling factor is not that the evidence proves the thief had a general scheme or intent to steal, for example from various stores in a mall or various offices in a complex, but rather whether the thief was acting under *the same impulse to steal* at the time of both thefts. The evidence must be sufficient for the fact finder to conclude beyond a reasonable doubt that the thief formed separate and distinct intents or impulses to steal in order to constitute separate larcenies.

*Id.* at 497–98, 489 S.E.2d 697 (emphasis in original).

The Court of Appeals's discussion in *White*, of *Bane v. State*, 327 Md. 305, 609 A.2d 313 (1992), is helpful to our analysis here. In *Bane*, the defendant broke into an exterior building and then entered two business offices located within the building. The offices were separated by a hallway and unlocked and open doors. The issue in the case was whether the interior business units were separate storehouses for purposes of the storehouse breaking statute, so that there

could be two prosecutions for violating that statute. The Court held that there was but one violation, because, "[u]nless it is objectively apparent that there are two or more storehouses in the building into which the defendant breaks, . . . one breaking can only constitute one violation of the statute." 327 Md. at 316, 609 A.2d 313. The Court "concluded that, when dealing with separate offices or units within a single building, only if the separate offices are 'readily identifiable as such' as 'to make it objectively apparent that they are separate' can they be regarded as separate storehouses." *White, supra,* 348 Md. at 188, 702 A.2d 1263 (quoting *Bane, supra,* 327 Md. at 316, 609 A.2d 313).

The defendant in *Bane* had been convicted of two counts of felony theft, for taking property from each of the two business offices, and three counts of storehouse breaking. The circuit court merged the theft convictions into the storehouse breaking convictions, however, and therefore the Court of Appeals was "spared the need to address directly the single larceny doctrine." *White, supra,* 348 Md. at 186 n. 1, 702 A.2d 1263. Likewise, in *White,* the single larceny doctrine issue that might have been raised in *Bane* but was not—the takings of property from more than one separate office or unit within a single building—was not before the Court, as there the items were stolen from one office. The Court observed: "The two items taken by White were taken from a single office in which there were no evident internal separations and no evident indications that the items belonged to different persons." 348 Md. at 188, 702 A.2d 1263.

In the case at bar, the evidence showed that there was a front entrance reception desk for the gynecology department that faced the central third floor hallway where the elevators stopped. The main door to the gynecology department was next to the reception desk. The department consisted of 19 exterior offices located around all and parts of three walls of the building, and a number of interior offices and work areas. The offices of Carletto, Hendrickson, and Guldan all were exterior offices located on the wall of the

building farthest away from the reception area entrance to the departments. The offices were separated by walls and each had its own door.

The appellant entered the gynecology department, walked down a hallway leading to the far wall of exterior offices, and then walked down the hallway on which those offices (including the offices of Carletto, Hendrickson, and Guldan) were located. He entered one office, located a purse, and removed a credit card or cards from the purse. He then exited and entered the next office, doing the same. About ten minutes elapsed from when the appellant entered the gynecology department until he left it.

We conclude that the evidence supports a finding, beyond a reasonable doubt, that the appellant intended and accomplished three separate and distinct thefts, which he carried out in rapid succession. The offices in question were separate rooms. They were furnished for individual occupancy, each with a single desk. It would have been evident to the appellant from the layout of the department that the row of offices, and their furnishings, were separate units, belonging to different people. The appellant entered and exited each office, one at a time. The items he took from each office identified themselves as belonging to different people: credit cards with the cardholders' names on them.

Before stealing the credit cards, the appellant lined up three women to participate in an operation to "make some money." The appellant's enlistment of the women in advance, to use credit cards he had not yet stolen, shows that his objective was to steal credit cards belonging to more than one female person. Going from one office to another, and to another, locating in each a purse, and taking credit cards from inside each purse, was a means to quickly obtain credit cards, with the knowledge that they belonged to three different women.

The evidence reasonably showed that the appellant was not acting under a single impulse to steal when he took the credit cards. To be sure, he had a single design to steal credit cards belonging to different women in a short period of time. The

evidence showed that the thefts were distinct, however, and each was intended separately by him, although perpetrated in quick succession.

Accordingly, the appellant properly was convicted on three counts of misdemeanor theft for stealing the credit cards of Carletto, Hendrickson, and Guldan.

**(b)**

In Maryland, the general standard for determining whether two offenses merge is the "required evidence" test, also known as the *Blockburger* test. *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *Brooks v. State,* 284 Md. 416, 419–20, 397 A.2d 596 (1979). Under this test, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not." *Blockburger, supra,* 284 U.S. at 304, 52 S.Ct. 180. *See also Sifrit v. State,* 383 Md. 116, 137, 857 A.2d 88 (2004); *Grant v. State,* 141 Md.App. 517, 541, 786 A.2d 34 (2001). If the offenses merge and are thus deemed to be one crime, separate sentences are prohibited as contrary to double jeopardy principles. *Snowden v. State,* 321 Md. 612, 616–17, 583 A.2d 1056 (1991); *Simpson v. State,* 121 Md.App. 263, 290, 708 A.2d 1126 (1998).

The appellant's misdemeanor theft convictions, under CL section 7–104, were for the unlawful taking of property with a value of less than $500 from Carletto, Hendrickson, and Guldan, the property taken being credit cards. Theft under CL section 7–104, subpart (a), includes "willfully or knowingly obtain[ing] or exert[ing] unauthorized control over property, if the person (1) intends to deprive the owner of the property . . . ." Theft of property with a value less than $500 is a misdemeanor. CL § 7–104(a)(2). *See Moore v. State,* 163 Md.App. 305, 878 A.2d 678, 2005 WL 1630122 (2005) (holding that valid, usable credit card is property of some value for purposes of crime of theft of less than $500 pursuant to CL section 7–104).

██ The appellant's felony theft scheme conviction, under CL sections 7–104 and 7–103(f), was for theft of the merchandise, having a value of $500 or greater, purchased by Tam, Ebony, and Wetmore by use of the stolen credit cards. CL section 7–103(f) provides:

> When theft is committed in violation of this part under one scheme or continuing course of conduct, whether from the same or several sources: (1) the conduct may be considered as one crime; and (2) the value of the property or services may be aggregated in determining whether the theft is a felony or a misdemeanor.

See also Painter v. State, 157 Md.App. 1, 14–15, 848 A.2d 692 (2004); Younger v. State, 94 Md.App. 644, 646, 618 A.2d 280 (1993). Of course, theft is an element of the more complex crime of theft by continuing scheme. Painter, supra, 157 Md.App. at 11, 848 A.2d 692.

██ The appellant argues that, under this Court's holding in Younger, supra, his misdemeanor theft convictions should merge into his felony theft scheme conviction. In Younger, the defendant shoplifted merchandise from a mall store; drove to the other side of the mall; and then shoplifted merchandise from another mall store. She was convicted of two counts of misdemeanor theft (one for shoplifting from one store and one for shoplifting from the other store) and one count of felony theft scheme.[3] This Court held that, because the "two misdemeanor offenses were part of the felony theft scheme, the misdemeanor convictions should merge into the felony theft [scheme] conviction, as they were part of the continuing course of conduct." 94 Md.App. at 648, 618 A.2d 280.

Younger plainly is distinguishable from the case at bar. There, the thefts from the two stores were the same thefts that were an element of the crime of theft by continuing scheme. See also Painter, supra. Here, there is no such unity of conduct or transaction. The takings comprising the

---

3. The felony theft scheme charge permitted aggregation of the values of the merchandise taken from the two stores.

continuing theft scheme were the takings of merchandise from the various retail stores—for which there were no separate theft convictions—not the takings of the credit cards, on which the misdemeanor theft convictions were based.

To be sure, the thefts of merchandise from the various retail stores were related to the thefts of the credit cards, in that some of the stolen credit cards were used to purchase the merchandise. Committing the misdemeanor theft crimes thus enabled the appellant to carry out, through others, the thefts comprising the felony theft scheme. The conduct or transaction of stealing property consisting of a credit card is not the same conduct or transaction as obtaining or exerting control over other property by use of the stolen credit card, however. The sentences imposed for the appellant's felony theft scheme conviction and his misdemeanor convictions did not punish him for the same conduct or transaction. Accordingly, the trial court did not err by not merging the misdemeanor convictions into the felony conviction.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANT.**